IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,     :

     Plaintiff,     :

          Case No. 3:09cr175

    vs.     :

          JUDGE WALTER HERBERT RICE

ENRIQUE AGUANDO-GARCIA, et al.,     :

     Defendants.     :

---

DECISION AND ENTRY OVERRULING MOTION TO SUPPRESS
EVIDENCE AND STATEMENTS FILED BY DEFENDANT RONY
MONTEJO-MONTEJO (DOC. #29); DECISION AND ENTRY
SUSTAINING IN PART AND OVERRULING IN PART MOTION TO
SUPPRESS EVIDENCE AND STATEMENTS FILED BY DEFENDANT
ENRIQUE AGUANDO-GARCIA (DOC. #30), JOINED IN BY DEFENDANT
LEOBARDO AREVALO-VELA (DOC. #31)

---

The Defendants Enrique Aguando-Garcia ("Aguando-Garcia"), Rony Montejo-

Montejo ("Montejo-Montejo") and Leobardo Arevalo-Vela ("Arevalo-Vela"), are each

charged in the Indictment (Doc. #13) with conspiring to distribute and to possess

with intent to distribute heroin. The Government obtained much of the evidence to

support that charge as a result of the stop and search of a Lincoln Town Car in

which Aguando-Garcia was a passenger, the search of the house located at 920

Wyoming Street ("920 Wyoming"), and statements made by the Defendants, all of

which occurred on December 1, 2009. Montejo-Montejo (Doc. #29) and Aguando-

Garcia (Doc. #30) filed Motions to Suppress Evidence and Statements. This Court permitted Arevalo-Vela to join in those motions.[1] See Notation Entry on Doc. #31. On April 14, 2010 and May 26, 2010, this Court conducted an oral and evidentiary hearing on the Defendants' requests to suppress evidence and statements, and the parties have filed their post-hearing memoranda. See Docs. ##40 through 45. The Court now rules upon Montejo-Montejo's and Aguando-Garcia's Motions to Suppress Evidence and Statements (Docs. ##29 and 30, respectively), joined in by Arevalo-Vela (Doc. #31).

At 11:00 a.m., on December 1, 2009, agents of the Drug Enforcement Administration ("DEA") and members of the Dayton Police Department Drug Task Force (collectively "officers") began to conduct surveillance on the house at 920 Wyoming, a two-story, single-family residence.[2] That house has front and back doors, and a detached garage on the alley which runs behind the residence. The surveillance was being conducted by DEA Special Agent Pat Flood ("Flood"), Task Force Officers Mike Auricchio ("Auricchio"), Rodney Barrett ("Barrett"), Tom

---

[1]Although the Court has permitted Arevalo-Vela to join in both motions filed by his Co-Defendants, he has only addressed the suppression of evidence seized from the residence at 920 Wyoming and his statements in his post-hearing memoranda. See Docs. ##40 and 44. He has not addressed the lawfulness the seizure of evidence from the Lincoln Town Car, which is the subject of only Aguando-Garcia's motion. Therefore, the Court treats Arevalo-Vela's motion as joining in only the motion filed by Montejo-Montejo.

[2]The officers were observing that house, because intelligence indicated that activity consistent with street level drug transactions had been occurring in the alley behind it.

Lubonovic ("Lubonovic") and Jorge DelRio ("DelRio"), and Dayton Police Detective Tim Braun ("Braun").

At about noon, the officers observed a brown Toyota being driven out of the garage. Some of them, including Flood, followed in their vehicles. Flood was able to observe the two occupants of that vehicle. He identified the passenger as Aguando-Garcia. The officers then ceased following the brown Toyota and returned to 920 Wyoming, as did Aguando-Garcia shortly thereafter, in the brown Toyota.

About 4:00 p.m., a Lincoln Town Car was driven into the alley and stopped behind the house at 920 Wyoming. Officers observed Aguando-Garcia leave the rear of that house, walk to the rear of the Lincoln Town Car and open its trunk. He then placed a suitcase and a duffle bag in the trunk and a third bag in the back seat. Aguando-Garcia then seated himself in the front, passenger seat of that vehicle. Since the officers believed this activity was classic among drug dealers and money launderers, they decided to follow the Lincoln Town Car, as it was driven west on the alley. That vehicle proceeded to Route 35, where it turned left to enter that highway. Flood, DelRio and Barrett all observed the Lincoln Town Car fail to signal properly, as it made that turn. As a consequence, the officers decided to request that a Dayton Police officer, in a marked cruiser, make a traffic stop of the Lincoln Town Car.

The Lincoln was driven west on Route 35, until it reached Interstate 75, where it proceeded north on the latter highway, leaving that highway at the Benchwood exit. That vehicle was pulled over on Miller Lane by two marked Dayton Police cruisers. When a uniformed officer began to issue a traffic citation

to the driver of the Lincoln Town Car,[3] Barrett requested that Huber Heights Police Officer Aaron Harlow ("Harlow") come to the scene with his drug detection canine, Sammy. Harlow arrived at the scene about ten minutes after the Lincoln Town Car had been stopped, while the citation was being written. The officers at the scene requested that Harlow's canine conduct a free-air search of the Lincoln Town Car. Harlow started his dog in the middle of the vehicle's front bumper and directed it to walk around it in a counterclockwise direction. When the canine reached the front passenger door, it aggressively alerted, scratching the door, indicating the presence of controlled substances in the automobile.

After Sammy had alerted,[4] officers began to search the front passenger compartment, where they discovered a black shoulder bag with an open flap, allowing them to observe the butt of a handgun, and several cell phones. The officers then removed the two bags from the trunk, which they had seen Aguando-Garcia place therein. They placed the three bags (two from the trunk and the shoulder bag from the passenger compartment) on the ground, to permit Sammy to conduct a free-air search. Harlow's canine alerted on one of the bags. Inside that bag, officers found $230,000 in cash, which had been placed in airtight bags, each containing $23,000.[5]

---

[3]The driver had been placed in a police cruiser to allow the police to write the citation.

[4]When the drug detection dog initially alerted on the Lincoln Town Car, Barrett asked the driver of that automobile, an individual named Vasquez, if there were any drugs inside. He indicated that there should not be any drugs therein, and, in response to the officer's request for consent, told Barrett to go ahead and search the vehicle.

[5]Inside that bag, the officers also discovered a heat sealer with empty bags and $4,000 in cash bundled by a rubber band.

- 4 -

While the vehicle was being searched, Officer Ronald Velez ("Velez"), a Spanish speaking officer employed by the Dayton Police Department, began to question Aguando-Garcia, after the latter had indicated that he did not speak English. Before asking Aguando-Garcia any questions, Velez read him his Miranda warnings in Spanish and asked him whether he would be willing to talk to the officers. Aguando-Garcia indicated that he understood his rights and would talk to the officers without an attorney. He told Velez that the money was to purchase real estate in Mexico and that it had arrived from Atlanta. He could not, however, explain to Velez how the money had arrived in Dayton or who had given it to him.

After the completion of the search of the Lincoln Town Car and the bags contained therein, the officers decided to return to 920 Wyoming, in order to talk with those who were located in that residence, by conducting a "knock and talk." Those who had been following Aguando-Garcia were soon joined by additional officers from the Dayton Police Department. At about 6:00 p.m., they returned to 920 Wyoming, where five officers walked onto the front porch and two watched the rear exit of that residence. The officers were wearing Dayton police vests, marked "police" and with badges on them. While they were on the front porch, they could see through the front window into the living room where Montejo-Montejo and Arevalo-Vela were sitting, watching television.[6] When Sergeant Spires of the Dayton Police Department knocked on the door, those two Defendants got up from the couch. Detective Dave House ("House") of the Dayton Police Department informed the other officers that it appeared that one of the two

_____

[6]The illumination from the television lighted that room.

- 5 -

who had been sitting on the couch had rapidly picked up something, although he did not indicate that he believed that the individual had picked up a firearm.

Montejo-Montejo answered the door; DelRio, who is fluent in Spanish, was standing in the doorway.[7] After identifying himself and the other officers, DelRio asked for consent to enter the residence in order to talk with them. Montejo-Montejo indicated that they could and opened the door to permit the officers to enter. Five officers entered the residence. None of them had displayed or brandished a firearm. As DelRio began to speak with Montejo-Montejo and Arevalo-Vela, one of the officers on the porch, Detective Kevin Phillips ("Phillips") of the Dayton Police Department, walked past the other officers, as well as Montejo-Montejo and Arevalo-Vela, to the location in the residence to which House had said someone had gone. Using his flashlight, he was able to locate an Uzi hidden under a rug near the stairway.[8]

After the Uzi had been found, Montejo-Montejo and Arevalo-Vela were patted down and told to sit on the floor, until wooden chairs for them to sit on could be retrieved from the dining room area.[9] No officer raised his firearm when the Uzi was discovered, nor was either Defendant threatened, handcuffed or struck by any officer. In addition, the exchange between the officers and the two Defendants remained calm, peaceful and cooperative. DelRio then asked Montejo-

---

[7]Arevalo-Vela was standing further back in the residence. Indeed, officers could not see him until the door had been completely opened.

[8]Phillips neither requested nor was given consent to search any area of the house at 920 Wyoming, before he began his search.

[9]No weapons were discovered on either of these Defendants when they were patted down.

Montejo and Arevalo-Vela questions about their identity, drivers' licenses and immigration status. They were not given <u>Miranda</u> warnings before being questioned. Thereafter, DelRio requested and received consent from the two to search the residence.[10] During the search,[11] officers discovered a handgun and a quantity of heroin hidden in a drop ceiling in Montejo-Montejo's bedroom. In addition, they discovered a quantity of cash and what they believed to be a log of drug transactions. At that point, the two Defendants were arrested and placed in custody.

As indicated, various Defendants request that the Court suppress the evidence, seized when the house at 920 Wyoming and the Lincoln Town Car were searched, and their statements to officers. In particular, Arevalo-Vela requests that the Court suppress the firearm seized by Phillips, the other evidence that was seized when the house at 920 Wyoming was searched and any statements he made to officers on December 1, 2009. <u>See</u> Doc. #40). Montejo-Montejo has requested the same relief (<u>see</u> Doc. #41),[12] while Aguando-Garcia has requested that the Court suppress his statements and the evidence seized from the Lincoln Town Car. <u>See</u> Doc. #43. In addition, he seeks the suppression of all other

_____

[10]During his conversations with Montejo-Montejo and Arevalo-Vela, DelRio spoke Spanish.

[11]Arevalo-Vela told the officers that he had placed the Uzi where it was found, because officers had knocked on the door and he did not want them to see it. He also denied that the firearm was his.

[12]Montejo-Montejo has also argued that his Fourth Amendment rights were violated when he was subjected to a pat down. This Court need not address that issue, given that there is no indication that any evidence was discovered as a result of the pat down.

evidence seized by law enforcement and any statements he made, as fruit of the poisonous tree.  Id.  As a means of analysis, the Court will initially rule on the Defendants' request to suppress the evidence that was seized, following which it will turn to their requests that their statements be suppressed.

## I.  Suppression of Evidence

As a means of analysis, this Court will initially discuss the request to suppress the evidence seized from the Lincoln Town Car, following which it will turn to the parties' arguments concerning the evidence taken from the residence at 920 Wyoming.

## A.  Evidence Seized from the Lincoln Town Car

As an initial matter, Aguando-Garcia argues that the evidence seized from the Lincoln Town Car must be suppressed, because what may have been a lawful traffic stop became a de facto arrest, which was not supported by probable cause.[13]  An ordinary traffic stop is analogous to a seizure under Terry v. Ohio, 392 U.S. 1 (1968).  See Berkemer v. McCarty, 468 U.S. 420, 438 (1984); United

_____

[13]Although Aguando-Garcia does not expressly argue that the traffic stop violated his rights under the Fourth Amendment, he does state that he was "allegedly stopped for a traffic violation."  Doc. #43 at 3.  Therefore, the Court will briefly set forth its reasons for concluding that the traffic stop comported with constitutional standards.  The Sixth Circuit has held that "[a] police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct."  United States v. Townsend, 305 F.3d 537, 541 (6th Cir. 2002).  See also Whren v. United States, 517 U.S. 806, 813 (1996).  Herein, a number of officers saw the Lincoln Town Car being turned onto Rt. 35, without its turn signal being activated.  The Court credits that testimony and, therefore, concludes that the initial stop of the Lincoln Town Car did not violate the Fourth Amendment.

States v. Palomino, 100 F.3d 446, 449 (6th Cir. 1996). In Illinois v. Caballes, 543 U.S. 405 (2005), the Supreme Court held that the Fourth Amendment is not implicated, when a drug detection dog is walked around the exterior of a vehicle, sniffs the car and alerts on it, indicating that controlled substances are located therein, as long as the vehicle was lawfully stopped and the actions of the drug detection dog did not extend the stop. Therein, the Court also reiterated that "[a] seizure that is justified solely by the interest in issuing a [traffic] ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Id. at 407. In Palomino, the Sixth Circuit elaborated upon that principle, indicating that, even if the initial stop were lawful, any subsequent detention must not be excessively intrusive. Id. Put differently, once the purpose of the traffic stop has been completed, a motorist cannot be further detained, unless something that occurred during the stop generated a reasonable and articulable suspicion of illegal activity. United States v. Mesa, 62 F.3d 159, 162 (6th Cir. 1993). See also, United States v. Townsend, 305 F.3d 537 (6th Cir. 2003); United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999) ("Reasonable police conduct under such circumstances is such that any subsequent detention after the initial stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to circumstances justifying the initial interference.... Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot.") (citations omitted), cert. denied, 528 U.S. 1176 (2000); United States v. Torres-Ramos, 536 F.3d 542, 553-54 (6th Cir. 2008) (noting that "once the purpose of the traffic stop

is completed, a police officer may not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention") (internal quotation marks and citations omitted).

Herein, the evidence causes this Court to find that the officers did not extend the stop beyond the time reasonably needed to complete the mission of writing a traffic citation for Vasquez, the driver of the Lincoln Town Car. As soon as the uniformed officers began to issue the traffic citation, Barrett requested that the Huber Heights Police Department dispatch Harlow and his canine to the location of the stop. Harlow arrived within 10 minutes, before the traffic citation had been written. Within a few minutes of his arrival, Sammy, the drug detection dog, alerted on the front passenger door of that vehicle. The traffic citation had not at that point been issued to Vasquez.[14] Consequently, this Court finds that the detention of Aguando-Garcia, from the time of the stop until the traffic citation was issued to Vasquez, did not constitute an unreasonable seizure in violation of the former's Fourth Amendment rights.

Additionally, Aguando-Garcia argues that the alert on the Lincoln Town Car by Harlow's drug detection dog did not provide probable cause to search the Lincoln Town Car. The Sixth Circuit has noted that:

> A warrantless search of an automobile is permissible if probable cause exists to believe it contains evidence of a crime. United States v. Ross, 456 U.S. 798, 809 (1982). There is probable cause to justify a warrantless search of a vehicle once a properly trained and reliable drug detection dog alerts

---

[14]The citation was being written, while the canine was conducting the free-air search of the Lincoln Town Car. After the dog had alerted, Barrett signed the ticket, because he had observed the traffic violation.

positively to the presence of drugs. United States v. Hill, 195 F.3d 258, 273 (6th Cir. 1999).

United States v. Perez, 440 F.3d 363, 374 (6th Cir. 2006), cert. denied, 549 U.S. 1014 (2006). See also United States v. Diaz, 25 F.3d 392, 393-94 (6th Cir. 1994) (holding that "[a] positive indication by a properly [] trained dog is sufficient to establish probable cause for the presence of a controlled substance" and that, to establish such probable cause, "the training and reliability of the dog must be established"); Torres-Ramos, 536 F.3d at 553-54 (same).

Herein, the evidence established that Harlow and Sammy were jointly trained at Gold Shield Kennel in Columbus, Ohio. Harlow testified that his drug detection dog has been trained to detect illegal narcotics, as an aggressive indicator, by scratching when the canine detected narcotics. Transcript of April 14, 2010, Evidentiary Hearing (Doc. #38) at 142-43 ("My dog is trained as an aggressive indicator which means when he detects illegal narcotics, he scratches."). Moreover, Harlow also received instruction on how to continue his dog's training, after he had returned to duty. Moreover, Harlow has continued to train his canine since he returned to duty. That evidence establishes that Sammy was a properly trained drug detection dog.

The question of whether Sammy was reliable poses a much closer question. Harlow was never asked whether his canine was reliable or had been certified. Harlow's testimony concerning the reliability his dog is as follows:

> Q. Do you from time to time take the dog through certain exercises?
> A. Yes, absolutely.
> Q. What would the purpose of that be?
> A. To maintain that the dog's reliable, that the dog's not alerting to things that are not illegal narcotics that he's trained on and that he is alerting to those illegal narcotics that he is trained on.

> Q. And during the course of these types of exercises with the dog, do you have situations where the presence of narcotics is known not to be present?
> A. That is correct.
> Q. And are you determining at that point whether or not we're going to get false positives so to speak?
> A. That is correct.

Id. at 143. While this is as weak a showing of reliability as one can imagine, the Court draws an inference from Harlow's testimony that the purpose of the exercises was to maintain the dog's reliability. One does not maintain a trait (in this instance the reliability of a drug detection dog) unless the trait is present in the first instance. Therefore, the Court finds that Harlow's drug detection dog was reliable.

Based upon the foregoing, the Court concludes that Harlow's drug detection dog established probable cause to search the Lincoln Town Car when it aggressively alerted on that vehicle.[15] Indeed, this Court's conclusion in that regard comports with the reasoning of the Sixth Circuit in United States v. Berry, 90 F.3d 148, 153 (6th Cir.), cert. denied, 519 U.S. 999 (1996):

> We find that the information contained in the affidavit in this case was sufficient to establish the training and reliability of the drug-detecting dog. The affidavit's references to the dog as a "drug sniffing or drug detecting dog" reasonably implied that the dog was a "trained narcotics dog." Further, the affidavit stated that the dog was trained and qualified to conduct narcotics investigations.
>
> Nonetheless, defendant contends that the affidavit in support of the search warrant was inadequate because it failed to establish the dog's reliability and credibility. Contrary to defendant's suggestion, to establish probable cause, the affidavit need not describe the particulars of the dog's training. Instead, the affidavit's accounting of the dog sniff indicating the presence of controlled substances and its reference to the dog's training in

---

[15]Given that conclusion, it is not necessary to address the Government's alternative argument that Vasquez consented to the search of the Lincoln Town Car.

narcotics investigations was sufficient to establish the dog's training and reliability.

Id. at 153.

Accordingly, this Court overrules Aguando-Garcia's Motion to Suppress Evidence and Statements (Doc. #30), as it relates to the evidence seized from the Lincoln Town Car.


B.  Evidence Seized from the House at 920 Wyoming

Montejo-Montejo and Arevalo-Vela argue that the Court should suppress both the Uzi that Phillips seized and the other evidence seized when the officers searched the residence after the two Defendants had consented to such a search. As a means of analysis, the Court will initially address the question of whether the Uzi was lawfully seized, following which it will turn to the constitutionality of the seizure of the other evidence.


The evidence would not support a finding that the Uzi was in plain view when the officers entered the residence at 920 Wyoming, nor is there evidence that Phillips or any other officer obtained consent to search that residence before Phillips conducted a mini-search and seized the Uzi.  Nevertheless, the Government argues that the search for and seizure of the Uzi met constitutional standards, because it was carried out for purposes of officer safety.  See Doc. #42 at 8-9.  In United States v. Ponder, 240 Fed. Appx. 17 (6th Cir. 2007), the Sixth Circuit summarized Circuit precedent on the lawfulness of the warrantless entry and

search of a residence, based upon apprehension about the safety of officers or others:

> In order to show that the warrantless entry and search of a residence was justified based upon a "risk of danger," the Government must show that "there was a risk of serious injury posed to the officers or others that required swift action." United States v. Huffman, 461 F.3d 777, 783 (6th Cir. 2006) (citing Whren v. United States, 517 U.S. 806, 813 (1996)). More specifically, a "risk of danger" exists where 1) the officers have a reasonable belief that a suspect in the home has a weapon; and 2) the officers can demonstrate that the suspect had a willingness to use the weapon. Causey v. City of Bay City, 442 F.3d 524, 529 (6th Cir. 2006). Accordingly, in Causey, our court held that it was reasonable for officers to enter a residence on New Year's Eve without a warrant because, after learning that a gun had been fired on the property six times, it was necessary for the officers to "ascertain whether someone inside the house was in peril," despite the fact that 1) a neighbor had informed the officers that shots had also been fired from the home on previous holidays; 2) the officers had spoken to the occupants through a window and the occupants had told the officers that no one was injured; and 3) the officers made no observations that contradicted the occupants' assurances. Id. Our court upheld the search because the facts indicated that there was someone within the residence who had both a weapon and a willingness to use it and, thus, the officers had a justified, reasonable belief that either they or others were in imminent peril of bodily harm.

> Similarly, we have upheld warrantless searches due to a "risk of danger" in Dickerson v. McClellan, 101 F.3d 1151 (6th Cir. 1996), and Hancock v. Dodson, 958 F.2d 1367 (6th Cir. 1992). In Dickerson, our court held that a warrantless entry into a home was justified where a neighbor called 911 to report that nine gunshots had been fired; the occupant of the house was drunk; and the officer heard the occupant yelling in a threatening tone. 101 F.3d 1151. In Hancock, our court held that exigent circumstances existed where, in addition to a shots-fired report, the police also knew from the suspect's psychologist that the suspect was "suicidal and possibly homicidal" and that he had threatened to kill any responding officer. Hancock, 958 F.2d at 1375-76. These cases are unlike United States v. Bates, in which our court held that no exigent circumstance existed, even though the officers believed that the suspect had a handgun in his residence, since the officers possessed no specific information suggesting that the suspect was likely to use the weapon or become violent. 84 F.3d 790, 795-796 (6th Cir. 1996).

Id. at 20-21.  Herein, the evidence does not cause this Court to find that Phillips or any other officer had a reasonable suspicion to believe that either Montejo-Montejo or Arevalo-Vela had a weapon and/or that either had a willingness to use same.

Accordingly, the Court sustains Montejo-Montejo's Motion to Suppress Evidence and Statements (Doc. #29), joined in by Arevalo-Vela (Doc. #31), to the extent that they request the suppression of the Uzi seized by Phillips.

As indicated, those two Defendants also seek the suppression of the other evidence seized when the officers searched the residence at 920 Wyoming.  In United States v. Hudson, 405 F.3d 425 (6th Cir. 2005), the Sixth Circuit reiterated that:

> "Consent must be ... unequivocal, specific, and intelligently given, uncontaminated by any duress and coercion."  United States v. Butler, 223 F.3d 368, 375 (6th Cir. 2000) (quoting United States v. Williams, 754 F.2d 672, 674-75 (6th Cir. 1985)); see also United States v. Ivy, 165 F.3d 397, 401 (6th Cir. 1998).

Id. at 443.  The Sixth Circuit has repeatedly held that the Government has the burden of proving consent by the preponderance of the evidence.  United States v. Canipe, 569 F.3d 597, 602 (6th Cir. 2009); United States v. Henry, 429 F.3d 603, 616 n. 16 (6th Cir. 2005); United States v. Haynes, 301 F.3d 669, 679 (6th Cir. 2002); United States v. Riascos-Suarez, 73 F.3d 616, 625 (6th Cir. 1996).  Whether the Government has met its burden in that regard "is a question of fact to be determined from the totality of all the circumstances."  Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).

Herein, this Court finds that Montejo-Montejo and Arevalo-Vela gave their consent to search unequivocally and intelligently, rather than as a result of duress

or coercion.  Each of those Defendants signed a consent form provided to them by DelRio.  Indeed, DelRio informed them that they had the right to refuse to give their consent to the search.  Moreover, there is no evidence that any officer threatened, displayed or brandished his firearm, handcuffed or struck either of those Defendants.  On the contrary, the exchange between the officers and the two Defendants remained calm, peaceful and cooperative.  The fact that these Defendants had been told to sit in the middle of the floor while wooden chairs for them to sit in were retrieved from the dining room, and that a number of agents were in the house does not cause this Court to find that Montejo-Montejo and Arevalo-Vela consented to the search of 920 Wyoming as a result of duress or coercion.[16]

Accordingly, the Court overrules Montejo-Montejo's Motion to Suppress Evidence and Statements (Doc. #29), joined in by Arevalo-Vela (Doc. #31), as it relates to the evidence, other than the Uzi, seized from 920 Wyoming.


II.  Suppression of Statements

As indicated, each of the three Defendants seeks the suppression of his statements to officers.  As a means of analysis, the Court will initially review certain legal standards applicable to all such requests, following which it will turn to the parties' individual arguments in support of and in opposition to the motions seeking suppression of those statements.

---

[16]Arevalo-Vela points out that two officers watched the rear door, while five entered the residence at 920 Wyoming.  In the absence of evidence, however, that Montejo-Montejo and Arevalo-Vela were aware of the presence of the two officers watching the rear door, that fact does not enter into the calculus of whether those two Defendants' consent was the product of coercion or duress.

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court announced a prophylactic rule requiring that a suspect be provided with certain warnings before being subjected to a custodial interrogation. See also Stansbury v. California, 511 U.S. 318 (1994); Oregon v. Mathiason, 429 U.S. 492 (1977). Herein, each Defendant was questioned; therefore, the parties focus their arguments on whether one or both was in custody when that questioning occurred. In determining whether an individual was in custody for purposes of Miranda warnings, a court must examine all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (quoting Mathiason, supra, 429 U.S., at 495). See also, Stansbury, 511 U.S. at 322. As the United States Supreme Court has instructed, "the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation." Berkemer v. McCarty, 468 U.S. 420 (1984). Accord, United States v. Crossley, 224 F.3d 847, 861 (6th Cir. 2000).

In United States v. Mahan, 190 F.3d 416 (6th Cir. 1999), the Sixth Circuit restated familiar principles that must be applied to ascertain whether an individual was in custody when interrogated:

> For an individual to be "in custody," there must be "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." Thompson [v. Keohane, 516 U.S. 99, 112 (1995)] (citation and internal quotation omitted). In determining whether a suspect is "in custody" for purposes of applying the Miranda doctrine, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984). See also Thompson, 516 U.S. at 112 (stating that the custody determination hinges upon whether, "given those circumstances, would a

reasonable person have felt he or she was not at liberty to terminate the interrogation and leave").

Id. at 421. In United States v. Salvo, 133 F.3d 943, 948 (6th Cir.), cert. denied,

118 S.Ct. 1805 (1998), the Sixth Circuit explained:

> The Supreme Court has distinguished between "custodial interrogation" and the mere questioning of a suspect in a "coercive environment":
>> [A] noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question.
>
> [Oregon v. Mathiason, 429 U.S. 492, 495 (1977)]. See also, United States v. Phillip, 948 F.2d 241, 247 (6th Cir. 1991), cert. denied, 504 U.S. 930 (1992) ("Coercive environments not rising to the level of formal arrest ... do not constitute custody within the meaning of Miranda."); United States v. Knox, 839 F.2d 285, 291-292 (6th Cir. 1988), cert. denied, 490 U.S. 1019 (1989).

Id. at 948. In United States v. Ozuna, 170 F.3d 654 (6th Cir. 1999), the Sixth

Circuit stressed that, since an objective standard must be applied to ascertain

whether the defendant was in custody, the subjective beliefs of the defendant

and/or the interrogating officer are not dispositive. Id. at 658.

In United States v. Lawrence, 1989 WL 153161 (6th Cir. 1989), cert.

denied, 494 U.S. 1019 (1990), the Sixth Circuit held that when a defendant seeks

to suppress his statements on the basis that he was not given Miranda warnings,

he has the burden of proving by the preponderance of the evidence that he was

entitled to those warnings, because he was subjected to a custodial interrogation.

Accord, United States v. Davis, 792 F.2d 1299, 1309 (5th Cir.), cert. denied, 479

U.S. 964 (1986); United States v. Charles, 738 F.2d 686, 692 (5th Cir. 1984).

Herein, Aguando-Garcia contends that he gave his statements in violation of

Miranda, and that he did not voluntarily and intelligently waive his right to remain

silent. See Doc. #43 at 3-4. This Court does not agree. Officer Velez, who had

spent his pre-teen years in Puerto Rico and is fluent in Spanish, testified that he

had read Aguando-Garcia his Miranda rights, in Spanish, from a card that had been

provided to him. Transcript of May 26, 2010, Evidentiary Hearing (Doc. #39) at

204. Velez also testified that the Defendant indicated that he understood his rights

and that he was willing to talk to the officers without the presence of an attorney.

Id. at 204-06. The Court credits that testimony and, therefore, finds that

Aguando-Garcia was provided the requisite Miranda warnings and that he

voluntarily and intelligently waived those rights. Accordingly, the Court overrules

Aguando-Garcia's Motion to Suppress Evidence and Statements (Doc. #30), as it

relates to his statements.[17]

Montejo-Montejo and Arevalo-Vela were not provided their Miranda

warnings, before they were questioned. The issue with those two Defendants is

whether they were subjected to a custodial interrogation. In other words, had they

been formally arrested or subjected to a restraint on their freedom of movement of

---

[17]As indicated above, Aguando-Garcia argues that the Court should suppress his
statements and all other evidence as fruit of the poisonous tree, the poisonous tree
being the illegal search of the Lincoln Town Car. Given that this Court has
concluded that the evidence was not illegally seized from that vehicle, there is no
poisonous tree, of which the Defendant's statements could be fruit. Accordingly,
the Court rejects Aguando-Garcia's assertion that his statements and all other
evidence must be suppressed as fruit of the poisonous tree.

the degree associated with a formal arrest.  <u>Beheler</u>, 463 U.S. at 1125.  This Court

finds that he Defendants have failed to prove by the preponderance of the evidence

that they were in custody or their freedom was so restrained when they were

questioned.

In <u>United States v. Hinojosa</u>, 606 F.3d 875 (6th Cir. 2010), the Sixth noted

that it considers the following factors when determining whether the interrogation

of a defendant was of a custodial nature:

> (1) the location of the interview; (2) the length and manner of the
> questioning; (3) whether there was any restraint on the individual's freedom
> of movement; and (4) whether the individual was told that he or she did not
> need to answer the questions.

Id at 883.  <u>See also</u> <u>United States v. Panak</u>, 552 F.3d 462 (6th Cir. 2009).  The

<u>Hinojosa</u> court also noted that it was significant that the questioning had occurred

at the defendant's home, given that "such a venue generally does not present a

coercive environment."  606 F.3d at 883.  Combining that fact with the facts that

the interview was of short duration, lasting only a few questions, and officers had

not acted in a hostile or coercive manner, had not drawn their weapons, threatened

the defendant or handcuffed him, the <u>Hinojosa</u> court concluded that Hinojosa had

not been interrogated in a custodial setting.  Similarly, herein, Montejo-Montejo and

Arevalo-Vela were questioned in their own residence and asked only a few brief

questions.  The atmosphere was calm and cooperative, rather than being coercive.

Although the officers were armed, none brandished or displayed his firearm.  In

addition, the Defendants were not threatened or placed in handcuffs before being

questioned.  Indeed, there is some evidence that they had been restrained to a

limited degree before and subsequent to their being questioned.  For instance, they

were told that they had to sit on the floor, while wooden chairs were being obtained for them to sit on, and officers, rather than the Defendants themselves, retrieved their Social Security cards, after each Defendant had admitted to DelRio that he had shown him a fake one. However, the fact that the Defendants' freedom of movement had been curtailed, when they were interrogated, does not mean that they were in custody in the Miranda sense. See Berkemer, 468 U.S. at 436-39 (holding that the interrogation of a motorist stopped for a traffic violation is not of a custodial nature, merely because the motorist's freedom of movement has been restrained and he is not free to leave).

Accordingly, the Court overrules Montejo-Montejo's Motion to Suppress Evidence and Statements (Doc. #29), joined in by Arevalo-Vela (Doc. #31), as it relates to their statements.


In sum, the Court overrules Aguando-Garcia's Motion to Suppress Evidence and Statements (Doc. #30) in its entirety, while it sustains in part and overrules in part Montejo-Montejo's Motion to Suppress Evidence and Statements (Doc. #29), joined in by Arevalo-Vela (Doc. #31), sustaining it only to the extent that suppression of the Uzi has been requested.


September 27, 2010

WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT


Copies to:

Counsel of Record.